IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

DOUGLAS BALSEWICZ,

                        OPINION AND ORDER

           Plaintiff,

                        12-cv-153-bbc

      v.

TAMMY MAASEN, KENNETH ADLER,
SGT. CLARK and SGT. HAGGLUND,
in their individual and official capacities,[1]

          Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Plaintiff Douglas Balsewicz is proceeding on a complaint filed under 42 U.S.C. §

1983 in which he contends that defendants Tammy Maassen, Kenneth Adler, Sgt. Clark and

Sgt. Hagglund were deliberately indifferent to his severe foot and back pain, in violation of

the Eighth Amendment to the United States Constitution.  He argues as well that they were

negligent under state law in their treatment of plaintiff.  Plaintiff contends that defendant

Dr. Adler failed to provide him adequate medical treatment for his conditions, that

defendant Maassen failed to intervene in his medical treatment to insure that it was

adequate and also failed to respond to plaintiff's complaints and requests for health care,

that defendant Clark objected to plaintiff's coming to the dining room in open-toe sandals

---

[1] In plaintiff's proposed complaint he spelled Sgt. Clark's name with two K's.  The
spelling has been changed to reflect the actual spelling of the name.

and that defendant Hagglund told plaintiff that he could no longer use a wheelchair at meals.

The case is before the court on defendants' motion for summary judgment. Defendants maintain that the record shows that defendant Adler, a doctor at the Jackson Correctional Institution, did not take any actions or neglect any duties in attending to plaintiff that could be characterized as negligent or in deliberate disregard of plaintiff's serious medical needs. They contend that defendant Tammy Maassen cannot be held liable on any of plaintiff's claims because she did not provide any direct patient care to plaintiff, she did not serve in a position in which she could override Dr. Adler's medical decisions and she responded to all of plaintiff's correspondence about his health care needs. As for defendants Sgt. Clark and Sgt. Hagglund, defendants say that plaintiff has failed to allege any actions on their part that would amount to deliberate indifference or negligence.

I conclude that no reasonable jury could find that defendant Dr. Adler failed to provide adequate medical treatment to plaintiff, that defendant Maassen had any authority to intervene in Dr. Adler's treatment, that she ignored plaintiff's requests for health care or that defendants Clark and Hagglund took any action with respect to plaintiff's medical condition that violated his constitutional rights or constituted negligence under state law.

From the facts proposed by the parties, I find that the following are both undisputed and relevant.

UNDISPUTED FACTS

A. Medical Care by Dr. Adler

Defendant Kenneth Adler, M.D., is employed by the Wisconsin Department of Corrections Bureau of Health Services as a physician in the Health Services Unit at the Jackson Correctional Institution, located in Black River Falls, Wisconsin.  He received his medical degree from the University of Wisconsin Medical School in 1987 and has been licensed to practice medicine in Wisconsin since 1989.  At Jackson, his duties and responsibilities include attending to the medical needs of inmates and diagnosing and treating illnesses and injuries.  He also is the physician supervisor responsible for physicians and nurse practitioners at seven other state penal institutions.

Plaintiff Douglas Balciewicz first met with Dr. Adler on March 26, 2010, three days after plaintiff was transferred to the Jackson Correctional Institution.  Plaintiff told Adler he had foot and back pain.  He said he felt a ripping sensation in his left foot when he stepped down on it and that his right foot felt as if needles were piercing his first through third toes whether weight bearing or resting.  Adler found tenderness when he palpated plaintiff moderately in his left sacroiliac area, but no obvious deformities on his feet.  When Adler examined plaintiff, plaintiff exhibited pain behavior when Adler externally rotated his left hip 45 degrees and had pronounced pain behavior at only 10 degrees of external rotation of the right hip.  However, when he was taking off and putting on his shoes and socks, he was able to rotate his hips 90 degrees without exhibiting any pain behavior.  Adler was not convinced that plaintiff had the pain he described.  Adler concluded that plaintiff's

performance on his examination were consistent with his having a non-organic cause for his pain behavior, not warranting the use of opioids.  He planned to taper plaintiff off the morphine he had been taking and substitute the analgesic sulindac for the ibuprofen plaintiff had been taking when he entered Jackson.  He also declined to write "restrictions" for a wheelchair, open-toe sandals and an extra mattress and pillow.  (The prison refers to these matters as "restrictions" rather than "authorizations.")  Plaintiff renewed his request for a wheelchair and open-toe sandals again on March 29, 2010, but it was rejected.

Within a week after first seeing plaintiff, Adler had arranged for him to be seen at Black River Memorial Hospital, by Dr. Helstad, whom he had been seeing while he was housed at the New Lisbon Correctional Institution.  Adler asked Helstad to check plaintiff for chronic foot pain, possible Morton's neuroma and pain at his proximal plantar fascia. (When a physician determines that an inmate has a medical problem that requires an off-site visit to see a specialist or have a procedure that cannot be performed at the institution on a non-urgent basis, the physician is required to submit a Class III request to the Bureau of Health Services.  Alternatively, the physician may submit the request to a committee of doctors and nurse practitioners for review at its weekly meeting.  The committee determines whether the request is medically necessary and whether an alternative treatment would better meet the inmate's medical needs. If the Class III request is approved under either of these options, the submitting physician is notified and the Health Services Unit will make an appointment for the inmate to be seen off-site by a consulting physician.)

Helstad recommended sandals and orthopedic tennis shoes for plaintiff and a second

opinion from another podiatrist regarding surgery and pain management. Adler arranged for plaintiff to have tennis shoes for recreation, sandals at other times and a wheelchair for distances. He stopped plaintiff's sulindac medication and substituted ibuprofen for six months, 600 mg three times a day, as needed for pain.

Also in early April 2010, Adler received a report from a unit officer, saying that plaintiff showed minimal pain behavior on the unit and that he was using his cane infrequently. On April 9, Adler met with plaintiff for followup of his foot and back pain. Plaintiff said that he had had some relief from his back pain with physical therapy but that the pain still interfered with his sleep. Adler noted that plaintiff was still walking with a cane in his right hand, that he walked slowly and that his great toes were pulled up and he kept his toes on both feet dorsal flexed throughout his visit. When he examined plaintiff, he found "tender left plantar fascia origin, tender plantar area of both feet at second/third metatarsal heads." Adler aff., exh. #47-1, at 17. Plaintiff was wearing flat-bottomed canvas tennis shoes with basic foot orthotics in place.

Adler found plaintiff's back pain stable and noted that plaintiff was receiving physical therapy. He prescribed heel cups and recommended that plaintiff buy padded insoles for his shoes. After meeting with plaintiff, Adler viewed a DVD showing plaintiff walking with a smooth gait, without his toes pulled up as they had been when he came into the Health Services Unit and not obviously putting any weight on his cane. Adler revoked the cane restriction as unnecessary.

Plaintiff did not always see Adler when he wanted to or when he complained about

his health or his medication.  He did not see him between April 9 and June 10, 2010.  At that time, plaintiff gave a description of the location of his foot pain that differed significantly from what he had described in March and in April.  After the June visit, Adler changed plaintiff's shoes to state-issued standard shoes with heels, thinking that the heels would help relieve plaintiff's plantar fasciitis.  By mistake, the Health Service Unit bought plaintiff tennis shoes that were later confiscated because plaintiff had no medical need for them.  The sandal restriction for mealtimes remained in place.

On June 16, June 21 and July 19, plaintiff submitted Health Service Requests complaining of the intense pain from his feet when he walked, the difficulty he was having without his cane and the fact that his back pain was keeping him from sleeping.  Plaintiff sent more requests in August complaining of his treatment and his extreme pain.  Adler met with him on August 20, 2010 for a followup of his foot pain and his complaints of back pain.

In September, Adler submitted a request for plaintiff to be seen at the podiatry department at the University of Wisconsin Hospitals and Clinics for a review of his bilateral foot pains, varied pain behavior and modest relief in his left foot pain with capsaicin.  Adler's referral request was granted and he arranged for x-rays of plaintiff's feet to be taken.

On October 1, 2013, Dr. Kalker saw plaintiff at the UW podiatry department clinic and recommended immediate mobilization of plaintiff's left foot, an MRI of the foot and sclerosing agent injections.  Adler followed up with a request for approval of the MRI, which was taken on November 9, 2010.  Six days later he met with plaintiff, who was wearing the cast boot recommended by the UW clinic, and who reported he had diminished pain in that

6

foot and in his right foot as well.  Adler noted that plaintiff was walking from his wheelchair to the exam room and exam table without difficulty.  Adler discussed the MRI report of the left foot with plaintiff, explaining that it showed plantar fasciitis and avascular necrosis (bone death from lack of blood supply) in the lateral talar dome with no evidence of Morton's neuroma.  Adler arranged for another appointment at the podiatry clinic and a followup clinic visit.

At the second visit to the podiatry department, on November 29, 2010, plaintiff told Dr. Kalker that his left ankle pain had lessened with the immobilizer boot he had been given. This was the first time that plaintiff had mentioned ankle pain; he had never referred to it on his first visit to Kalker, to Adler or to the podiatrist at the Black River Memorial Hospital. Kalker recommended that plaintiff use a night splint, have orthotics for his shoes and have an ultrasound of his right foot at the podiatry clinic to determine whether he had Morton's neuromas and have ultraound guided injections with sclerosing agents, if appropriate.

On December 13, Adler met with plaintiff.  Plaintiff said that little had changed with his feet and that his back pain bothered him 5 to 10 minutes about twice a week.  Adler extended plaintiff's low bunk and low tier restrictions for three months, continued a TENS unit as needed for back pain for six months and an ice bag for left foot pain for three months, as needed.  In addition, Adler arranged for an ultrasound at the UW Hospital and obtained medical committee approval for orthotics, ultrasound and injections.  Plaintiff received the injections at the UW Hospital on December 21, 2010.

In 2011, plaintiff saw defendant Adler on March 30, April 29, July 6, October 11,

November 22 and December 21.  He refused two visits with Adler on February 17 and 28 and failed to show up for a scheduled appointment on April 15.   (Plaintiff says that he was never told of the appointment.)  In February, Adler arranged for a follow-up visit for plaintiff at the UW podiatry department, which occurred on March 18.  Dr. Kalker recommended additional sclerosing injections.  Adler arranged another visit on April 28 for the injections.  On April 29, plaintiff saw Dr. Kalker for more followup of his foot problems.  Plaintiff was complaining of left ankle tenderness and tenderness in his right second toe interspace.  He made no mention of left plantar fasciitis or toe pain.

On April 29, plaintiff told Adler that his back pain was worse from sitting in vans to attend his medical appointments, that he had not tried riding the exercise bike as Adler had recommended and that the Meloxicam anti-inflammatory Adler had prescribed had not helped.  Adler increased the dosage for three months and arranged to see plaintiff for a follow-up visit in one month.

Plaintiff had more sclerosing injections on May 17 and May 23, 2011.  On June 3, Adler arranged for another UW podiatry department visit.  Plaintiff was seen there on June 11.  He went back again on August 16 for casting of orthopedic shoes.  On August 24, he was seen by Dr. Ruikus at the Gundersen Lutheran Clinic in La Crosse for an orthopedic consultation for his talar dome problems.  He went back to the same clinic on September 27, where he saw Dr. Ringstrom, a podiatrist.

In 2012, plaintiff saw Adler on February 10, March 22, April 24, May 30, June 14 and July 6 for followup of his back and foot pain.  Plaintiff refused a clinic visit in January;

he says it was because he had been denied use of a wheelchair.   Adler arranged for plaintiff

to be seen by Dr. Ruikus at the Gundersen Clinic on January 5 for a podiatry evaluation and

possible surgery.  Ruikus recommended that plaintiff use a Triloc brace on his left ankle, that

he have the use of a wheelchair and an exercise bike and that he be housed in a cell with a

toilet.  The same day, Adler placed a three-month order for plaintiff to have a cell with a

toilet, refrain from weight bearing on his left foot for three months, have use of the Triloc

brace provided by Dr. Ruikus during waking hours and have a wheelchair available when he

left his cell.  On January 23, Adler adjusted plaintiff's medication and scheduled a clinic visit

within three weeks to review plaintiff's foot pain.

At plaintiff's February 10 visit, Adler assessed chronic low back pain, nonspecific,

chronic left ankle pain, which was evaluated by Dr. Ruikus, and other pain that was being

followed by Dr. Ringstrom.  Adler discontinued most of plaintiff's medication and prescribed

25 mg of indomethacin twice a day as needed for pain and encouraged plaintiff to use the

exercise bike.

In March, both Dr. Ringstrom and Dr. Ruikus recommended surgery for plaintiff's

neuroma.  On March 15, Adler submitted a request for left ankle surgery and right Morton's

neuroma surgery.  The medical committee approved the request on March 30 and the

surgery took place on April 9.  Plaintiff was prescribed hydrocodone following surgery, as Dr.

Roukis had recommended.  Adler ordered it for him at the prison, discontinuing the

Tramadol plaintiff had been taking.  He continued the hydrocodone after Dr. Ringstrom

recommended it at his April 17 post operative followup with plaintiff, along with the ice

packs and lotion for massages to the surgical site that Ringstrom suggested.

On May 30, plaintiff went to the Black River Memorial Hospital with back and thigh pain. The staff recommended 40 mg of prednisone daily, along with 10 mg of Flexeril. When Adler saw plaintiff the next day, Adler's diagnosis was possible muscle strain. He ordered ice, a Ketorolac 30 mg injection once at 8:30 a.m. and again at noon, and kept plaintiff in an infirmary room for observation.

At his July 6 visit, plaintiff was continuing to complain of pain in his back and in the top of his left foot with any weight bearing. On examination, Adler assessed ongoing low back pain and ongoing left ankle pain.

Although Adler is a general practitioner, without specialized training in the treatment or management of pain, he has considerable experience in that subject. He and other physicians working for the Department of Corrections try to limit short-acting opioids such as Morphine, oxycodone, codeine and hydrocodone in the correctional system because of the high potential for abuse by inmates. Generally, they prescribe short-acting opioids for acute pain of identified organic origin, such as an injury or after surgery, and for a short period of time, such as a week or less. They will prescribe long-acting opioids such as methadone, oxycontin and MS Contin, for terminally ill inmates and for non-terminal, chronic pain conditions of identified organic origin.

If individuals taking opioids do not take them properly but crush them in the mouth and swallow them, snort them nasally or combine short-acting opioids with long-acting opioids, they face an increased danger of overdose. Opioids often have other effects, such

as constipation, sedation and respiratory depression.  Persons taking opioids for chronic conditions will tend to require increasingly higher doses to achieve the same manner of pain control.  Alternative pain relievers, such as Tylenol, Ibuprofen, aspirin, Gabapentin, Carbamazepine, Capsaicin cream and Lidocaine ointment, can change the way pain is perceived.

From defendant Adler's experience in the correctional setting, he knows that many inmates had substance abuse problems that led to their incarceration, that many inmates have been known to divert their opioid medications to others and that one inmate has died of an overdose in the last two years.  He believes it is important to use caution in prescribing opioids in this setting and to be careful in selecting the particular opioid to use.  Since August 2011, any doctor that intends to start a patient on opioids for a period in excess of three months must obtain approval from the prior authorization committee.

B. Defendant Tammy Maassen

Defendant Tammy Maassen is a registered nurse and a Health Service Manager in the Health Services Unit at Jackson.  Her duties include management and supervision of health care services, development of procedures, the monitoring of care plans, preparation of reports and serving as liaison to other disciplines, institution units and community health care providers.  She works with the primary care physician, dentist, psychiatrist and specialists serving as consultants for the Bureau of Health Services.  She provides the overall administrative support and direction of the unit, but she has no right to control the details

of the medical practices of the treating physicians in the performance of their duties or override their treatment decisions.  In the normal course of her job, Maassen's job duties do not include determining the order in which Health Service Unit staff respond to requests. That job is done by nursing staff on a daily basis.

When an inmate is given a Health Service Unit Medical Restriction, a copy of the form is sent to his housing unit by Health Service Unit staff and placed in the unit binder for unit staff information and implementation.

Defendant Maassen did not provide any direct care to plaintiff but she did respond to various pieces of inmate correspondence and Health Service Requests from him.  Plaintiff sent Maassen an Interview/Information Request from plaintiff around April 9, 2010, saying that it was not true that he was not using his cane and complaining that defendant Dr. Adler was not following the recommendations of Dr. Helstad.  She replied that the doctor had made the decision to remove the cane restriction after viewing the video in which it appeared that plaintiff was not using his cane and that the doctor had reviewed Dr. Helstad's recommendations, but that he had the final decision making power.

Maassen had no personal involvement with the decision to require plaintiff to purchase his own tennis shoes after the Health Service Unit mistakenly purchased off-the-shelf tennis shoes from Walmart.

Plaintiff more requests for attention and more complaints.  He believed that staff nurses were scheduling him for appointments with Dr. Adler on days when Adler had state-ordered furloughs and that Adler was not keeping his appointments with plaintiff, that he

was not receiving the restrictions and medication that he wanted, that he needed more consultations with specialists and that he needed the names of the Therapeutic Committee that ruled on special health requests. Maassen responded to the requests and complaints and reminded plaintiff that a nurse was on duty at all times so that he could be seen on sick call if he needed attention.

Plaintiff wrote on December 15, 2011, asking for a copy of the directive from the pharmacy that stated that the Health Service Unit is able to dispense only 24 tabs of Tylenol 500 mg at a time. Maassen wrote back on January 26, 2012, saying that she did not have a copy of the directive but that Adler had told her that the directive had come from the committee/pharmacy. She added that the policy was not limited to the Jackson Correctional Institution and was intended to lower the risk of kidney damage or overdose.

On December 21, 2011, plaintiff submitted another Health Services Request, claiming that he had had no improvement in the pain in his lower back, neck and feet and that the medications were not working. He asked Maassen to overturn Adler's decisions and order a lidocaine/cortisone injection. She wrote back on January 25, 2012, to say she did not have the authority to overturn an order by a physician; she supervised the Health Services Unit but, as a nurse, she could not make medical decisions.

Once plaintiff was transferred to the Dodge Correctional Institution in July 2012, Maassen had no further involvement with him.

During the time that plaintiff was housed at the Jackson Correctional Institution, Maassen had no concerns about the treatment provided by Dr. Adler to plaintiff. Had she

had any such concerns she would have reported them to Dr. David Burnett, the Bureau of

Health Services Medical Director.

### C. Defendants Clark and Hagglund

Unit correctional staff are not qualified to make medical decisions or provide medical

services to inmates at the Jackson Correctional Institution. They have no control over

Health Service Unit staff. They must defer to the health care professionals about such things

as whether an inmate's medical condition requires medical restrictions.

On August 26, 2010, defendant Hagglund stopped plaintiff from using a wheelchair

to eat, saying that he did not have a wheelchair restriction.

On October 21, 2010, plaintiff filed an inmate complaint with the inmate complaint

examiner, complaining that defendant Clark had harassed plaintiff on and around October

9, 2010, by giving him a warning for wearing shower sandals in the dining room. The

examiner dismissed the complaint after informing Clark that plaintiff had a medical order

allowing him to wear his sandals and having the warning removed from plaintiff's record.

### OPINION

In the order granting plaintiff leave to proceed in forma pauperis, I discussed

plaintiff's complaints about his treatment at the Jackson Correctional Institution from mid-

March 2010 through July 2011. In briefing the motion for summary judgment, however,

the parties have proposed facts about plaintiff's treatment for the entire time he was

incarcerated at Jackson.  As long as they have done so, I will take into account all of the facts in determining whether defendants violated plaintiff's constitutional right to adequate medical care or were negligent in their provision of it while plaintiff was at Jackson.

## A. Dr. Adler

It is appropriate to start with Dr. Adler because plaintiff's complaints are directed primarily at him.  Clearly, plaintiff believes that Adler failed to provide him adequate treatment and by his failure, made his pain worse.  He contends that Adler violated the Eighth Amendment of the United States Constitution by not giving him the restrictions, pain medication and clinic visits he requested.

The Eighth Amendment imposes a duty on prison officials to provide medical care to the prisoners in their custody.  Estelle v. Gamble, 429 U.S. 97, 103 (1976).  Prison officials violate that duty when they are deliberately indifferent to a prisoner's serious medical need.   "An official is deliberately indifferent when he is subjectively aware of the condition or danger complained of, but consciously disregards it."  Rice ex rel. Rice v. Correctional Medical Services, 675 F.3d 650, 665 (7th Cir. 2012).   Showing deliberate indifference requires more than disagreeing with a doctor's medical judgment, showing that he made an incorrect diagnosis or that the doctor was negligent in improper treatment resulting from negligence is not to state an Eighth Amendment claim.  Gutierrez v. Peters, 111 F.3d 1364, 1374 (7th Cir.1997).

In this case, defendants have stipulated for the purposes of summary judgment that

plaintiff's foot and back problems constituted serious medical needs.  They maintain, however, that defendant Adler was not indifferent to plaintiff's foot and back problems; to the contrary, he was well aware of the problems, took them seriously and responded appropriately to them.

Defendant Adler believed that much of plaintiff's pain had a non-organic cause; nevertheless, he saw plaintiff frequently and arranged for consultations with podiatrists at the Black River Memorial Hospital, Gundersen Lutheran Clinic in La Crosse and the UW Hospital in Madison.  In 2010, he saw plaintiff at the Health Services Unit clinic on March 26, April 9, June 10, August 20, September 10, November 15 and December 13 for his complaints of back and foot pain.  In 2011, he saw plaintiff on six occasions (plaintiff refused two additional opportunities to be seen).  In 2012, he saw plaintiff six times before plaintiff was transferred to another institution.  At these sessions, Adler generally examined plaintiff, reviewed his complaints, evaluated his medication regime and, when appropriate, explained the findings and recommendations of the consulting physicians.

During the 28 months that plaintiff was housed at the Jackson Correctional Institution, he filed many complaints about defendant Adler's refusal to put in place the restrictions that plaintiff thought he needed, Adler's reluctance to prescribe narcotic pain medication, plaintiff's inability to see Adler as often as he thought necessary, plaintiff's canceled and rescheduled Health Service Unit visits, his disagreement with Adler about the kind of shoes he should be provided and allowed to wear, the lack of relief he was getting from the medicines or pain-relieving rubs that Adler prescribed, the pain he was experiencing

16

and his belief that Adler was interested only in harming him.  Even if all of plaintiff's complaints were legitimate, they do not amount to deliberate indifference under the Eighth Amendment.  They do not even amount to state law negligence because plaintiff has adduced no evidence that Adler's care fell below the standard of care exercised by the average practitioner in the class to which he belongs, acing in the same or similar circumstances. Sawyer v. Midelfort, 227 Wis. 2d 124, 149, 595 N.W.2d 423, 435 (1999).  A showing of medical malpractice requires expert testimony to establish the standard of care, except in the rare instance in which common knowledge affords a basis for finding negligence.  Carney-Hayes v. Northwest Wisconsin Home Care, Inc., 2005 WI 118 ¶ 35, 284 Wis. 2d 56, 699 N.W.2d 524 (2005).

Plaintiff has not adduced any evidence that  his condition was worsened by any delay in treatment or by any refusal by Adler to provide him the restrictions and shoes he believes he should have had.  He does allege that he suffered unnecessary pain because of Adler's reluctance to prescribe narcotic pain medication more frequently but he has adduced no evidence that Adler reduced his pain medication for improper reasons rather than because of institution regulations, his concerns about overprescribing addictive pain medications and his skepticism about the intensity of the pain plaintiff was experiencing.  Adler provided plaintiff opioids after surgery, as recommended by the surgeons, and he made efforts to find opioid substitutes that would be helpful to plaintiff on a long-term basis.

It is improbable that plaintiff could have found an expert who would support a claim of negligence.  Over the course of a little more than two years, Adler arranged for plaintiff

17

to see five different specialists for his foot problems, prepared plaintiff for the visits, followed each outside visit with a clinic visit to discuss the results of the visit with plaintiff, implemented the specialists' recommendations and made efforts to find medication that would reduce plaintiff's pain without the side effects of opioids.

## B. Defendant Maassen

It is undisputed that defendant Maassen did not have any authority to overrule Dr. Adler's medical judgments, to tell him which patients he should see and when or when he should see particular patients.  She had no authority to decide how plaintiff should be treated.  Plaintiff has not alleged that he ever saw Maassen him for medical care, which she does not provide as part of her usual job duties.  Accordingly, she cannot be held liable for a violation of his constitutional right to adequate medical care or for state law negligence. The situation might be different if she were the only one who knew that plaintiff needed care for a severe medical need and refused or failed to inform the medical staff or schedule that inmate for a medical visit.  In this case, however, plaintiff has adduced no evidence that she failed to pass along any information about plaintiff's medical needs to the appropriate Health Services Unit staff.  Rather, the undisputed evidence shows that she responded to plaintiff's numerous requests for information.

Defendants argue that no state law negligence claim can be asserted against defendant Maassen because plaintiff did not comply with the notice of claim requirements.  It is not necessary to decide whether defendants are correct about this point because plaintiff has not

18

come forward with any evidence that would support a finding of negligence against Maassen.

## C. Defendants Clark and Hagglund

Like defendant Maassen, defendants Clark and Hagglund had no authority to decide how plaintiff's medical problems should be treated or what restrictions he should have.  They were required to carry out the orders they had from the Health Services Unit and from their supervisors.   They could be held liable for violating the Eighth Amendment if they intentionally denied or delayed access to medical care or interfered intentionally with the treatment once it was prescribed.  Estelle, 429 U.S. at 104.  However, the only allegations that plaintiff makes about them is that defendant Clark objected to plaintiff's wearing sandals to the dining room and gave him a warning that was later rescinded and that on one occasion, defendant Hagglund  refused to let plaintiff use a wheelchair because he did not believe plaintiff had a wheelchair restriction.  Neither of these allegations rises to the level of a constitutional violation.

As with defendant Maassen, defendants Clark and Hagglund assert that plaintiff failed to file the notice of claim against them that is a statutory prerequisite to any claim of negligence under state law.  Plaintiff does not dispute this assertion, which means that he cannot proceed against either of them for a state law claim of negligence.

## D. Summary

In summary, I conclude that defendants are entitled to summary judgment in their

19

favor because they have shown that no reasonable jury could find for plaintiff on any of the

claims that he has raised.


ORDER

IT IS ORDERED that the motion for summary judgment filed by defendants Tammy

Maassen, Kenneth Adler, Sgt. Clark and Sgt. Hagglund is GRANTED.  The clerk of court

is directed to enter judgment for defendants and close this case.

Entered this 26th day of August, 2013.

                              BY THE COURT:
                              /s/
                              BARBARA B. CRABB
                              District Judge